# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3923

_____

Daryl L. Davis,                                          *
                                                         *
        Plaintiff - Appellee,                         *
                                                         *
v.                                                       *
                                                         *
Calzona Hall, Ex-Director, St. Louis                     *
County Department of Justice Services,                   *
in his individual capacity; Dora B.                      *
Schriro, Director, Missouri Department                   *
of Corrections, in her individual                        *
capacity; Robert A. Meechum,                             *
Lieutenant; Jacqueline D. Young;                         *
St. Louis County; Brian Goeke; Larry                     *
Wilson; Susan Martin; Stacy Breedon;                     *
John Prier; Travis Clyburn,                              *    Appeals from the United States
                                                         *    District Court for the Eastern District
        Defendants,                                   *    of Missouri.
                                                         *
Barbara Knell; Rebecca Atterberry,                       *
                                                         *
        Defendants - Appellants,                      *
                                                         *
Pat Roll,                                                *
                                                         *
        Defendant.                                    *

_____

No. 02-3924
_____

Daryl L. Davis,                              *
                                             *
        Plaintiff - Appellee,                *
                                             *
    v.                                       *
                                             *
Calzona Hall, Ex-Director, St. Louis         *
County Department of Justice Services,       *
in his individual capacity; Dora B.          *
Schriro, Director, Missouri Department       *
of Corrections, in her individual            *
capacity; Robert A. Meechum,                 *
Lieutenant; Jacqueline D. Young;             *
St. Louis County; Brian Goeke; Larry         *
Wilson,                                      *
                                             *
        Defendants,                          *
                                             *
Susan Martin; Stacy Breedon; John            *
Prier; Travis Clyburn,                       *
                                             *
        Defendants - Appellants,             *
                                             *
Barbara Knell; Rebecca Atterberry;           *
Pat Roll,                                    *
                                             *
        Defendants.                          *

_____

No. 03-1343
_____

Daryl L. Davis,                                     *
                                                    *
          Plaintiff - Appellant,                    *
                                                    *
     v.                                             *
                                                    *
Calzona Hall, Ex-Director, St. Louis                *
County Department of Justice Services,              *
in his individual capacity; Dora B.                 *
Schriro, Director, Missouri Department              *
of Corrections, in her individual                   *
capacity; Robert A. Meechum,                        *
Lieutenant; Jacqueline D. Young;                    *
St. Louis County; Brian Goeke; Larry                *
Wilson,; Susan Martin; Stacy Breedon;               *
John Prier; Travis Clyburn; Barbara                 *
Knell; Rebecca Atterberry; Pat Roll,                *
                                                    *
          Defendants - Appellees.                   *
                      _____

                Submitted:  November 17, 2003
                      Filed: July 14, 2004
                      _____

Before RILEY, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.
                      _____

MELLOY, Circuit Judge.

These interlocutory appeals follow the district court's disposition of the defendants' motions for summary judgment on Daryl Davis's § 1983 claims alleging due process violations in connection with his prolonged incarceration after he was ordered released. For the reasons stated below, we affirm in part and reverse in part.

## I. FACTUAL BACKGROUND[1]

In December of 1997, a jury convicted Daryl Davis of stealing $150 or more, a class C felony under Missouri law. The Missouri state court sentenced Davis as a prior offender and pronounced a seven-year term of imprisonment. He was transferred from county custody to the custody of the Missouri Department of Corrections to serve out his sentence at the Missouri state correctional facility, Fulton Reception & Diagnostic Center ("Fulton"). However, in March of 1999, the Missouri Court of Appeals reversed Davis's conviction and granted him a new trial. He entered into plea negotiations with the state prosecutor and agreed to enter an Alford plea to the stealing charge.[2] The Missouri Department of Corrections received the Court of Appeals mandate and, therefore, had knowledge that Davis's conviction had been reversed and that he was to remain incarcerated pending a new trial. When Davis's conviction was reversed, he acquired pre-trial detainee status.

At the prosecuting attorney's request, the state court judge issued a writ to the Fulton facility to effectuate Davis's court appearance in order to enter a plea and to receive his new sentence. The writ commanded the superintendent of Fulton to bring

---

[1]Pursuant to Federal Rule of Civil Procedure 56(c), we recite these facts in the light most favorable to Davis as the non-moving party. See, e.g., Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1016 (8th Cir. 2000) (construing the record in the light most favorable to the non-moving party).

[2]A defendant entering an Alford plea pleads guilty and consents to the imposition of a sentence while still proclaiming his or her innocence of the charged offense. See North Carolina v. Alford, 400 U.S. 25, 37 (1970).

Davis to the St. Louis County courthouse on April 22, 1999 and stated, "Be it further ordered that after said proceeding the defendant shall be returned forthwith to your custody."

The Department of Justice Services is a county agency and was charged with transporting Davis to the St. Louis County Courthouse. Davis was delivered without incident and, on April 22, 1999, entered an Alford plea. The judge imposed a one-year sentence with credit for time served. At this point, Davis had served approximately one and one-half years, and there were no other warrants or holds on him. The judge ordered that Davis be immediately released. The Judgment and Sentence Order stated, "Defendant is to receive credit for all time served. Defendant is to be discharged from custody immediately." The form that accompanied Davis when he was transported from Fulton to the courthouse anticipated the possibility of his release and indicated that, in the event of escape or release, Fulton officials were to be notified immediately.

Despite the judge's order that Davis was to be released immediately, county officials placed Davis back into county jail to await transport back to Fulton. Meanwhile, Department of Justice Services employee/defendant Jacqueline Young completed a "Release Approval Report" on Davis. She entered the following notation on the report: "1 YR DJS [Department of Justice Services]. DEFT IS TO RECEIVE CREDIT FOR ALL TIME SERVED-DISCHGD PER MEMO." Young was responsible for handling prisoners' paperwork and filed Davis's Judgment and Sentence Order in the county's files. She did not provide the Missouri Department of Corrections with a copy. Nor did she make an attempt to ensure that the Department of Justice Services returned a copy of the report to Fulton. Davis, however, personally retained a copy.

Davis remained incarcerated in the St. Louis County jail for four days before being transported back to Fulton. When the Department of Justice Services'

transportation unit brought Davis back to Fulton, officers completed a "Certificate of Delivery" form. This form listed all the prisoners who were transported from Department of Justice Services custody to Fulton and provided blank spaces to list the prisoners' names and the sentences imposed. On the day that Davis was transported to Fulton, the Certificate of Delivery listed ten prisoners. Sentences were recorded for seven of those ten prisoners; Davis's sentence was not listed.

Moreover, by way of their stamped signatures, state employees/defendants Patricia Roll and Bryan Goeke attested to the following:

> I HEREBY CERTIFY that the above named prisoners were delivered this 26th day of April, 99, and were accompanied by the above named officer(s) and guard(s), *together with a certified copy of the Judgment and Sentence in each case, stating the offense and number of years of commitment to the Department of Corrections, as set opposite their respective names*.

(emphasis added). Similarly, by statute, a certified copy of Davis's Judgment and Sentence Order should have been delivered to Fulton officials. See Mo. Rev. Stat. 217.305(2) ("Appropriate information relating to the offender shall be provided to the department in a written or electronic format, at or before the time the offender is delivered to the department, including, but not limited to: (1) A certified copy of the sentence from the clerk of the sentencing court . . . ."); cf. id. § 546.600 ("Whenever a sentence of imprisonment in a county jail shall be pronounced upon any person convicted of any offense, the clerk of the court shall, as soon as may be, make out and deliver to the sheriff of the county a transcript of the entry of such conviction, and of the sentence thereupon, duly certified by such clerk, which shall be sufficient authority to such sheriff to execute such sentence, and he shall execute the same accordingly."). Nevertheless, no one at Fulton ever received a copy of Davis's Judgment and Sentence Order.

The Certificate of Delivery and the absence of Davis's Judgment and Sentence Order were not the only mishandled pieces of information. A "court return form" should have accompanied Davis back to Fulton but did not. State employee/defendant Rebecca Atterberry, who was responsible for handling prisoners' paperwork at Fulton, testified that only 75-90% of prisoners who go out to court on writs come back with a court return form, notwithstanding the form's explicit directive to return the form with the prisoner. Specifically, the court return form provides:

> REQUIRED INFORMATION WHEN RETURNING AN OFFENDER TO THE DEPARTMENT OF CORRECTIONS
>
> THE DEPARTMENT OF CORRECTIONS MUST BE ADVISED OF THE PROCEEDINGS OR DISPOSITION OF ALL COURT CASES WHEN OFFENDERS ARE RETURNED FROM COURT ON WRITS OF HABEAS CORPUS AD PROSEQUENDUM. PLEASE PROVIDE AND RETURN THE FOLLOWING INFORMATION WITH THE OFFENDER . . . . NOTE: The top portion of this form is to be completed by the institution before the offender is released to the transporting authority. The bottom portion is to be completed by the court or county official before returning the offender to the designated institution.

After returning to Fulton, Davis repeatedly protested his continued incarceration but was ignored, met by indifference, or admonished for refusing to accept responsibility for his crime. On May 11, 1999, for example, Fulton transferred Davis to Farmington Treatment Center ("Farmington") to complete a behavior modification program designed to enable prisoners to integrate into society upon release. His offender management team at Farmington consisted of state employees/defendants Susan Martin, Stacy Breedon, and John Prier. Davis showed Martin his Judgment and Sentence Order when he arrived at Farmington. She asked

-7-

Davis for a copy, but he refused to give his only copy to her, because it was the only proof he had that he was to be released.

Martin's treatment notes also reflect that Davis demanded to be released on several occasions. After several such demands, Davis's management team held a meeting with state employee/defendant Travis Clyburn, who was a probation officer. He attended the meeting in order to explain Davis's sentence to him, but he did not address Davis's concerns. Nor did he check Davis's records or ask to see the Judgment and Sentence Order. In fact, no one at the meeting asked to see the order even though Davis previously had shown it to Martin. Instead, Martin's notes reflect that the management team scolded Davis for his "criminal thinking" in continuing to demand release. At least in part because of his insistence that he be released, Davis's management team dismissed him from the treatment program and returned him to Fulton.

Back at Fulton, Davis's protests fell on deaf ears. On June 10, 1999, Davis wrote a letter to Fulton officials. In the letter, he stated that he had a judge's order commanding his release, and he complained that it had been nearly two months since he was ordered set free. State employee/defendant Barbara Knell, a records officer at Fulton, "responded" to Davis's letter by informing Davis, "You were sent to the Farmington Treatment Center on 5-28-99. On 6-4-99, you were returned here as a Treatment Center failure. Since you failed that program, your status is now [parole violator]. You will now be classified and transferred to your permanent institution to complete your sentence."

On June 17, 1999, Davis met with Darren Vaughn, a parole officer at Fulton. For the first time since being re-sentenced in April, someone listened to Davis's story, learned the truth, and properly handled the situation. Davis was released the following day, fifty-seven days after he had been ordered released.

## II. PROCEDURAL BACKGROUND

Davis filed suit in federal district court pursuant to 42 U.S.C. § 1983, claiming that his substantive due process rights under the Fourteenth Amendment had been violated. He also pleaded false imprisonment and failure to supervise claims under state law. Davis named four St. Louis County defendants ("county defendants")—St. Louis County itself, Calzona Hall, Robert Meacham, and Jacqueline Young. Hall is the Director of the Department of Justice Services; Meacham is a former Department of Justice Services officer who accompanied Davis to court when he was re-sentenced in April of 1999; and Young is the records officer who completed Davis's Release Form and filed his Judgment and Sentence Order in the county files without providing the Missouri Department of Corrections with a copy.

Davis also named ten Missouri Department of Corrections defendants ("state defendants")—Dora Schriro, Brian Goeke, Larry Wilson, Susan Martin, Stacy Breedon, John Prier, Travis Clyburn, Barbara Knell, Rebecca Atterberry, and Pat Roll. Schriro is the Director of the Missouri Department of Corrections; Goeke was the Superintendent of Fulton until April 20, 1999; Wilson is the current Superintendent of Fulton; Martin and Breedon were members of Davis's management team at Farmington and are substance abuse counselors there; Prier was also a member of Davis's management team at Farmington and is a correctional officer; Clyburn is a probation officer at Farmington; Knell is a clerk/records officer at Fulton; Atterberry is a clerk/typist at Fulton; and Roll is Atterberry's supervisor.

Davis named all the individual defendants in their individual capacities and further named Hall in his official capacity. Davis characterized the defendants as either "county defendants" or "state defendants" and further categorized them into three sub-groups: (1) "defendants directly involved"—Meacham, Young, Martin, Breedon, Prier, Clyburn, Knell, Atterberry, and Roll; (2) "defendants responsible for policies and customs"—Hall, Schriro, Goeke, Wilson, and Roll; and (3) "defendant

principals"—Meacham, Young, Schriro, Goeke, and Wilson. In total, Davis pleaded sixteen counts against the various defendants and sought compensatory and punitive damages.

Pertinent to this appeal, the individual state and county defendants brought motions for summary judgment on the ground that each individual defendant was entitled to qualified immunity for his or her involvement in the case. The district court granted the county defendants' motion, finding that they were entitled to qualified immunity.[3] Moreover, the court entered judgment as a matter of law on Davis's claim against St. Louis County and on Davis's official-capacity claim against Hall. The court determined that Davis had failed to generate a trial-worthy issue as to the existence of a municipal custom or policy to which officials were deliberately indifferent. Having disposed of all of the § 1983 claims against the county defendants on summary judgment, the court further declined to exercise supplemental jurisdiction over Davis's state law claims against these defendants and dismissed the state law claims against the county defendants without prejudice.

As to the state defendants, the court rejected their contention that they were entitled to qualified immunity protection. Even so, the court granted Schriro, Roll, Wilson, and Goeke's summary judgment motion on the merits because they had no direct involvement in the allegedly unconstitutional acts in this case and because Davis had not alleged facts sufficient to hold them liable for their supervisory rolls. After the court's disposition of the state defendants' summary judgment motion, Atterberry, Knell, Martin, Breedon, Prier, and Clyburn remained. The court further

_____

[3]Davis sued Hall in both his official and individual capacities. The district court noted that neither qualified nor absolute immunity is available to Hall in his official capacity, e.g., Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999) ("Qualified immunity is not a defense available to governmental entities, but only to government employees sued in their individual capacity.") and granted him qualified immunity on Davis's individual-capacity claims against Hall.

found that, even as to the counts alleged against these remaining state defendants, there was insufficient evidence to support Davis's punitive damages claims and, consequently, dismissed them.

With regard to Davis's state law claims against the state defendants, the district court found that the official immunity doctrine protected them from Davis's false imprisonment claim and entered judgment in their favor. The court also entered judgment in favor of Schriro, Goeke, and Wilson on Davis's state law "failure to train and supervise" claim, and Davis has not pursued an appeal of that ruling. After the summary judgment rulings were complete, only Davis's claim for compensatory damages under § 1983 against the state defendants with direct involvement remained to proceed to trial. These defendants—Martin, Breedon, Prier, Clyburn, Atterberry, and Knell—filed an interlocutory appeal of the district court's denial of qualified immunity protection. Davis moved for certification under § 1292(b), and the district court granted his request. He, too, has appealed the district court's order of the adverse rulings against him.

III. JURISDICTION

Although three appeals with three different case numbers are before us, they are based on the same record and the same evidence. We have consolidated the three appeals for decisional purposes. We have jurisdiction to consider the state defendants' interlocutory appeal of the district court's denial of qualified immunity under the collateral order doctrine. Johnson v. Jones, 515 U.S. 304, 312 (1995); Mitchell v. Forsyth, 472 U.S. 511, 527 (1985). Davis has also appealed on the ground that the district court should not have entered summary judgment in favor of the county defendants on the ground of qualified immunity. However, "[t]he collateral order doctrine does not apply . . . when a party complains that the district court should not have *granted* summary judgment based on qualified immunity." Coleman v. Parkman, 349 F.3d 534, 537 (8th Cir. 2003).

-11-

Jurisdiction over the other aspects of Davis's appeal is possible under 28 U.S.C. § 1292(b). When the district court is willing to certify that an otherwise unappealable order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," we may exercise jurisdiction. 28 U.S.C. § 1292(b). "The certification by the district judge that a controlling question is involved is not binding on the court of appeals, which must exercise its own discretion in determining whether to accept an interlocutory appeal under § 1292(b)." 16A Charles Alan Wright et al., Federal Practice and Procedure: Jurisdiction 3d § 3951, at 278 n.20 (1999) (citing S. Rep. No. 2434, 85th Cong., 2d Sess., accompanying H.R. 6238 (Aug. 18, 1958), quoted in 1958 U.S.C.C.A.N. 5255, 5257); accord 28 U.S.C. § 1292(b) ("The Court of Appeals which would have jurisdiction of an appeal of [an order that the district court certified under § 1292(b)] may thereupon, in its discretion, permit an appeal to be taken from such order . . . ."). In this instance, we decline to exercise jurisdiction over appeal number 03-1343. Thus, the only issue before us today is whether the district court properly denied qualified immunity to state defendants Martin, Breedon, Prier, Clyburn, Knell, and Atterberry.[4]

## IV. QUALIFIED IMMUNITY

We review a district court's qualified immunity determination on summary judgment de novo. E.g., Collins v. Bellinghausen, 153 F.3d 591, 595 (8th Cir. 1998) (applying traditional de novo standard of review to summary judgment decisions

---

[4]The district court also denied qualified immunity to the other four state defendants, Schriro, Goeke, Wilson, and Roll. These defendants, however, did not appeal this ruling, presumably because the district court dismissed the claims against them on the merits. Therefore, while we use the term "state defendants" throughout the remainder of this opinion for the sake of convenience, we refer only to the appellant-defendants, Martin, Breedon, Prier, Clyburn, Knell, and Atterberry.

resting on qualified immunity). This standard of review requires us to view the summary judgment record in the light most favorable to the non-moving party, Davis, and to afford him all reasonable inferences to be drawn from that record. Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001). Entry of summary judgment resting on qualified immunity is appropriate if, viewed through this lens, no genuine issue of material facts exists regarding whether the officials' actions, even if unlawful, were objectively reasonable "in light of the legal rules that were 'clearly established' at the time [the actions were] taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (internal citation omitted).

42 U.S.C. § 1983 imposes civil liability upon any individual "who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Nevertheless, "[q]ualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Yowell v. Combs, 89 F.3d 542, 544 (8th Cir. 1996); accord Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). "What this means in practice is that 'whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'" Wilson v. Layne, 526 U.S. 603, 614 (1999) (quoting Anderson, 483 U.S. at 639). The Supreme Court has generously construed qualified immunity protection to shield "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Officials

-13-

are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

Courts employ a two-part inquiry to determine whether a lawsuit against a public official can proceed in the face of the official's assertion of qualified immunity. See Saucier v. Katz, 533 U.S. 194, 201 (2001); Coleman, 349 F.3d at 537 (describing qualified immunity inquiry as a two-part test); Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir. 2003) (same); Meloy v. Bachmeier, 302 F.3d 845, 848-49 (8th Cir. 2002) (same); Ware v. Morrison, 276 F.3d 385, 387 (8th Cir. 2002) (same); Washington v. Normandy Fire Prot. Dist., 272 F.3d 522, 526 (8th Cir. 2001) (same). This inquiry must be undertaken in the "proper sequence." Saucier, 533 U.S. at 200. First, courts must consider whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Id. at 201. The "existence or nonexistence of a constitutional right" is, therefore, the threshold question. Id.

If the answer to this first inquiry is no, courts do not delve further into the qualified immunity inquiry. See id. Instead, the defendant is entitled to qualified immunity, and the suit is not permitted to proceed. See id. However, if a constitutional right may have been violated, the second step requires courts "to ask whether the right was clearly established." Id. This is a fact-intensive inquiry and "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id.

In Davis's case, the district court denied qualified immunity to each of the ten state defendants: Schriro, Goeke, Wilson, Martin, Breedon, Prier, Clyburn, Knell, Atterberry, and Roll. The court first determined that Davis alleged that these defendants' actions violated his substantive due process right to be released from detention pursuant to a court order and at the expiration of his sentence. The court

next determined that this substantive due process right was clearly established.[5] The state defendants who have appealed challenge both of these conclusions.

For the reasons discussed below, we find that Davis alleged deprivation of a recognized constitutional right, that this right was clearly established, and that outstanding questions of fact preclude summary judgment on the ground of qualified immunity as to state defendants Knell, Martin, Breedon, Prier, and Clyburn. We find, however, that qualified immunity shields state defendant Atterberry from suit.

## A.  Deprivation of a Constitutional Right

### 1.    Constitutionally Protected Interest

The state defendants seek to characterize Davis's claim as one alleging a constitutional violation for their failure to investigate.  We understand Davis's complaint as alleging a violation of his liberty interest when he was detained for fifty-seven days after a judge ordered his release.  We have recognized a protected liberty interest in being free from wrongful, prolonged incarceration.  In Young v. City of Little Rock, 249 F.3d 730 (8th Cir. 2001), we sustained a jury verdict in favor of an unlawfully detained § 1983 plaintiff.  The plaintiff in Young was arrested on a Saturday afternoon when a warrant check showed she was wanted for failing to comply with conditions of her probation.  Id. at 732.  The plaintiff's sister-in-law, however, was the wanted individual and had used the plaintiff's name on occasion as an alias.  Id.  Due to several egregious missteps on the part of the arresting officer and the police communications officer, the misidentification was not immediately

---

[5]The district court also found that Davis had alleged an Eighth Amendment violation, but Davis does not pursue that claim on appeal.  Instead, he rests his case on the alleged violation of his Fourteenth Amendment right to substantive due process.

-15-

discovered.  Id.  After arriving at the county jail, the arresting officer soon discovered the mistake and attempted to rectify it, but his superiors concluded that the situation would have to be resolved by a judge on the following Monday.  Id.  At the plaintiff's probable cause hearing, the judge ordered that Young be released.  Id.  However, instead of releasing her, county jail officials put her in a holding cell for thirty minutes before chaining her to other prisoners, transporting her back to the county jail, strip searching her, and ultimately releasing her.  Id. at 732-33.

Her § 1983 claim against the city proceeded to trial.  Id. at 733.  Young alleged that her post-hearing detention deprived her of rights guaranteed by the Fourteenth Amendment.  Id.  By special verdict form, the jury returned a verdict in her favor on two separate periods of incarceration.  Id.  The first period consisted solely of the thirty minutes she was detained in the holding cell after the judge ordered her released.  Id.  The second period consisted of the time Young spent back at the county jail where she was strip searched.  Id.  We sustained both verdicts, rejecting the city's contention, among others, that the plaintiff was not deprived of a constitutional right during the first period.  Id.

The city argued on appeal that some time must be allowed to carry out an order of release in order to perform "out-processing."  Id. at 735.  The city also argued that the judge's order was ambiguous, because the judge used the phrase "show her released."  Id. at 736.  In addition, the city claimed that it was impractical to release Young immediately after the probable cause hearing because she was wearing prison garb (an orange jumpsuit) and did not have a change of clothes with her.  Id.  We held that the jury might have accepted these arguments but that it was not obligated to. See id.  Upholding the substantial verdicts, we stated:

> We grant that the amounts are high, but they are not so excessive as to be shocking.  The liberty of the individual is at stake here.  A citizen had been arrested, erroneously as it turned out, and a court had ordered her

released. The court's order had not been followed. Instead, a process of administrative foot-dragging took place, characterized by gross indignities.

Id.

Thus, as to the first period of detention in Young, we held that even a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment. See id. Similarly, in Slone v. Herman, 983 F.2d 107 (8th Cir. 1993), we stated that an inmate had a clearly established right to be released from prison once a judge's order suspending his sentence became final, because at that point, "the state lost its lawful authority to hold Slone. Therefore, *any continued detention unlawfully deprived Slone of his liberty*, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment." Id. at 110 (emphasis added). Accordingly, we denied qualified immunity protection to the prison officials/defendants. Id. at 109-11.

As in Young and Slone, Davis has alleged that the defendants deprived him of a protected liberty interest by continuing to confine him after he completed his sentence and was ordered immediately released. Other circuits have recognized this right as well. See, e.g., Lee v. City of Los Angeles, 250 F.3d 668, 683 (9th Cir. 2001) ("Moreover, '[t]he Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction.'" (quoting Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992))); Armstrong v. Squadrito, 152 F.3d 564, 576 (7th Cir. 1998) (concluding that the Due Process Clause guards against prolonged detentions without an appearance when a detainee complains of confinement following arrest pursuant to valid warrant); Alexander v. Perrill, 916 F.2d 1392, 1398 (9th Cir. 1990) ("[P]rison officials who are under a duty to investigate claims of computational errors in the calculation of prison sentences may

-17-

be liable for their failure to do so when a reasonable request is made."); Golson v. Dep't of Corrections, 914 F.2d 1491, 1990 WL 141470, \*\*1 (4th Cir. Oct. 2, 1990) (unpublished table decision) ("Incarceration beyond the termination of one's sentence may state a claim under the due process clause and the eighth amendment."); Douthit v. Jones, 619 F.2d 527, 532 (5th Cir. 1980) (finding claim based on continued confinement without valid judicial order was cognizable under § 1983 as a deprivation of due process); cf. Moore v. Tartler, 986 F.2d 682, 686 (3d Cir. 1993) ("Subjecting a prisoner to detention beyond the termination of his sentence has been held to violate the eighth amendment's proscription against cruel and unusual punishment. . . . [W]e did find that an eighth amendment violation occurred when an inmate was imprisoned nine months and eight days after the expiration of his sentence."); Sample v. Diecks, 885 F.2d 1099, 1108 (3d Cir. 1989) ("We think there can be no doubt that imprisonment beyond one's term constitutes punishment within the meaning of the eighth amendment."). For instance, the Eleventh Circuit has held that prisoners have a "constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release" and, in a misidentification case, cited cases from the Fifth and Seventh Circuits that also specifically recognized this right. Cannon v. Macon County, 1 F.3d 1558, 1563 (11th Cir. 1993) (citing Sivard v. Pulaski County, 959 F.2d 662 (7th Cir. 1992) (finding continued detention where sheriff knew it was wrongful states claim under § 1983 for due process violation), unrelated modification on rehearing, 15 F.3d 1022 (11th Cir. 1994) (per curiam); Sanders v. English, 950 F.2d 1152 (5th Cir. 1992) (holding failure to release after officer knew or should have known that plaintiff had been misidentified gives rise to cause of action under § 1983)).

The state defendants primarily rely on Scull v. New Mexico, 236 F.3d 588 (10th Cir. 2000) for the proposition that they did not have a duty to investigate Davis's claim of wrongful incarceration. In Scull, an Ohio inmate, Timothy Reed, was paroled and ordered not to leave the state. Id. at 592. Fearing for his life, Reed fled Ohio and settled in New Mexico. Id. When he failed to appear after being

charged with "terroristic threatening," Ohio officials issued a warrant for his arrest. Id. In Taos County, New Mexico, Reed was arrested as a fugitive but obtained a writ of habeas corpus to avoid extradition back to Ohio. Id. The Taos County judge ordered that he be released from the custody of Taos County. Id. State prosecutors appealed. Id.

Nearly two years later, Reed was involved in a minor traffic accident in Bernalillo County, New Mexico and was arrested when officers ran a routine warrant check on him that revealed Reed was wanted in Ohio. Id. Unbeknownst to the arresting officers, the Ohio warrant was the same warrant at issue in the Taos County case on appeal. Id. Reed immediately contacted his lawyers, who provided Bernalillo County officials with a copy of the writ and demanded Reed's release. Id. Bernalillo County officials engaged in negotiations with Reed's lawyers but refused to release him because the writ was specifically directed to Taos County, not Bernalillo County. Id. at 593-94. Reed remained incarcerated for thirty days in Bernalillo County until a state judge ordered that the Taos County writ was binding on Bernalillo County officials. Id. at 594.

Reed brought suit under § 1983 and several other state and federal statutes for his wrongful incarceration. Id. at 590-91. Pertinent to Davis's case and the state defendants' arguments on appeal, Reed sued the director of the Bernalillo County jail, a Bernalillo County jail caseworker, and a lieutenant at the Bernalillo County jail. Id. at 591. The Tenth Circuit Court of Appeals affirmed the district court's entry of summary judgment in favor of these county defendants, agreeing that they were protected by qualified immunity for two reasons. Id. at 597. First, the writ ordering Reed's release was specifically directed to Taos County. See id. The court found that, given the strict terms of the Taos County judge's order, Reed did not have either a constitutional or statutory right to be released from Bernalillo County custody. Id. Second, the Scull court rejected Reed's contention that, when faced with the writ directed to Taos County, Bernalillo County officials, at the very least, should have

-19-

investigated the matter.  Id.  The court disapproved of the county officials' handling of the matter but concluded that the Bernalillo County defendants "were not required by either the Constitution or statute to investigate independently Mr. Reed's claim that he should be released within this time frame."  Id. at 598.  Because Reed had not articulated a constitutional right alleged to have been violated, qualified immunity shielded the county officials from suit.  See id.

The Scull decision is inapposite for two reasons.  First, the state defendants' attempt to analogize the relationship between Taos County and Bernalillo County to the Department of Justice Services and the Missouri Department of Corrections is unavailing.  In Scull, Taos County and Bernalillo County were not acting in concert. They were two separate governmental entities that both happened to apprehend and detain Reed.  In Davis's case, the Judgment and Sentence Order specified "1 YR DJS," but Davis had been incarcerated at Fulton on a charge arising out of St. Louis County all along.  Moreover, Fulton officials received a copy of the Court of Appeals mandate reversing his conviction. The Missouri Department of Corrections arranged Davis's transportation and sent him to St. Louis County pursuant to that mandate and the ensuing writ.  The state defendants cannot claim ignorance as to what happened in St. Louis County simply because the Judgment and Sentence Order said "1 YR DJS," as opposed to "1 year Department of Corrections."  The same cannot be said of the Bernalillo County defendants who played no role in the Taos County litigation in Scull.

Second, the unequivocal terms of the writ at issue in Scull commanded that Reed be released from Taos County custody.  Given that, as noted above, Bernalillo County and Taos County did not have the sort of reciprocal relationship that St. Louis County and the Missouri Department of Corrections had in Davis's case, Bernalillo County officials lacked actual knowledge that Reed should not have been detained. Conversely, Davis had documentary evidence that he was entitled to be released, informed at least one person in writing (Knell) that he had a court order, showed at

least one person the order (Martin), and a jury could reasonably conclude that Martin informed state defendants Breedon, Prier, and Clyburn of the order's existence. In other words, because Davis possessed the order and because there is evidence that he told the state defendants of its existence and showed it to Martin, no "independent investigation" within the meaning of <u>Scull</u> was necessary. The clear terms of the Judgment and Sentence Order commanded Davis's release.

Even if we were to accept the state defendants' position that this is a case about the duty to investigate prisoners' claims, <u>Scull</u> is not dispositive. In fact, many circuits recognize the necessity of investigation under certain circumstances. The Court of Appeals for the Ninth Circuit has held that prison officials cannot "stand by idly after an inmate has raised the prospect that he is being unlawfully incarcerated and has provided documentary evidence in support of his claim." <u>Alexander</u>, 916 F.2d at 1398. Citing the <u>Alexander</u> case, the Third Circuit Court of Appeals commented that, in the context of a § 1983 claim alleging the deprivation of Eighth Amendment rights for prolonged incarceration, "[d]eliberate indifference has been demonstrated . . . where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation." <u>Moore</u>, 986 F.2d at 686. Thus, decisional law does not support the defendants' contention that there is never a duty to investigate a prisoner's claim that he is entitled to be released.

In any event, "whatever haziness obscures the exact contours of a duty to investigate burns off once the authorities *know* that they have no basis for detention." <u>Garcia v. City of Chicago</u>, 24 F.3d 966, 974 (7th Cir. 1994) (Cudahy, J., concurring in part and dissenting in part); <u>accord</u> <u>Whirl v. Kern</u>, 407 F.2d 781, 792 (5th Cir. 1968) ("[U]nlike his prisoner, the jailer has the means, the freedom, and the duty to make necessary inquiries. While not a surety for the legal correctness of a prisoner's commitment, he is most certainly under an obligation, often statutory, to carry out the functions of his office. Those functions include not only the duty to protect a prisoner, but also *the duty to effect his timely release*.") (emphasis added) (internal

citations omitted) (footnote omitted). Here, the evidence in the light most favorable to Davis shows that at least some of the state defendants were on notice that Davis was entitled to be released.

The state defendants also rely on the Supreme Court decision, <u>Baker v. McCollan</u>, 443 U.S. 137 (1979), in support of their contention that Davis has not alleged the existence of a right protected under the Fourteenth Amendment, thus entitling them to prevail on their qualified immunity defense. In <u>Baker</u>, police arrested Linnie McCollan after stopping him for a minor traffic violation and running a routine warrant check. <u>Id.</u> at 141. This check revealed that he was wanted for skipping bail. <u>Id.</u> McCollan protested his arrest and detention, arguing that the police had the wrong person. <u>Id.</u> In fact, police did have the wrong person. McCollan's brother, Leonard, had masqueraded as Linnie McCollan and was the subject of the warrant. <u>Id.</u> at 140-41. McCollan remained incarcerated for eight days before the police compared his appearance to a photograph on file from Leonard McCollan's arrest. <u>Id.</u> He was subsequently released and filed suit under § 1983. <u>See</u> <u>id.</u>

McCollan did not challenge the issuance of the warrant. <u>See</u> <u>id.</u> at 143. Instead, he simply maintained that the sheriff's "'intentional failure to investigate and determine that the wrong man was imprisoned'" was wrongful. <u>Id.</u> (quoting respondent's brief). The Supreme Court found that, "[w]hatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution." <u>Id.</u> at 144. The Court reasoned,

> [W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.
>
> . . . .

Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles. Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976), false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.

Id. at 145-46. Because McCollan did not allege the deprivation of a constitutional right, § 1983 was not a proper vehicle to seek redress for his injuries. Id. at 146-47.

While Baker provides some guidance, we do not think it precludes Davis's case from going forward for two reasons. First, again, despite the defendants' attempt to characterize Davis's case as one hinging on a constitutional right of investigation, Davis, not the defendants, is the master of his complaint. Davis has not alleged that he had a constitutionally protected interest in the defendants' investigation of his claim that he was entitled to release. Instead, he has alleged that his prolonged incarceration after being ordered released violated his right to liberty, which is protected by the Fourteenth Amendment's guarantee of due process of law. The defendants' failure to investigate pertains not to the protected interest alleged by Davis but to their state of mind, which will be discussed in greater detail below. See infra. Second, like the Fifth Circuit in Douthit, 619 F.2d at 532, we do not believe that Baker is controlling under the facts of this case:

This case presents a substantially different factual context from *Baker* since Douthit has alleged that the defendants imprisoned him for thirty days beyond the sentence imposed upon him without a valid commitment order. Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.

-23-

Indeed, we have little difficulty concluding that Davis has alleged the deprivation of a constitutionally protected interest, and the defendants' attempt to muddy the waters by mischaracterizing his claim does not sway us. The Baker Court left open the possibility that prolonged wrongful detention might rise to the level of a due process violation. The Court stated,

> We may even assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law."

Baker, 443 U.S. at 145 (omission in original). In his concurrence, Justice Blackmun emphasized his understanding that the majority's opinion did not foreclose the possibility of "whether a more lengthy incarceration might deny due process," but merely "conclude[d] only that 'every' claim of innocence need not be investigated independently." Id. at 148 (Blackmun, J., concurring). According to Justice Blackmun, "a prisoner in respondent's predicament might prove a due process violation by a sheriff who deliberately and repeatedly refused to check the identity of a complaining prisoner against readily available mug shots and fingerprints." Id.

Since Baker, several courts have recognized that the short duration of McCollan's detention in Baker was crucial to the outcome of the case. For example, the Seventh Circuit, in Coleman v. Frantz, 754 F.2d 719, 724 (7th Cir. 1985), understood Baker's analysis to turn on "the duration of the detention and the burden placed on state officials in providing procedural safeguards." The Eleventh Circuit has similarly stated that "[t]he Baker decision has not been read to preclude all § 1983 claims based on false imprisonment." Cannon, 1 F.3d at 1562. We agree.

-24-

2. Outstanding questions of fact

Davis's § 1983 complaint implicates a constitutionally protected interest under the Fourteenth Amendment's guarantee of due process of law, but prolonged detention does not rise to the level of a Fourteenth Amendment violation unless the defendants acted with the requisite state of mind. The protections of the Due Process Clause are triggered when "the official's conduct was conscience-shocking and [when] the official violated one or more fundamental rights that are 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" Moran v. Clarke, 296 F.3d 638, 651 (8th Cir. 2002) (en banc) (Bye, J., concurring) (internal citation omitted) (quoting Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997)). "The Supreme Court has taken a context[-]specific approach to determining whether intermediate culpable states of mind, such as recklessness, support a section 1983 claim by shocking the conscience and, thus, violating due process." Wilson v. Lawrence County, 260 F.3d 946, 956 (8th Cir. 2001).

In this instance, Davis will have to prove that the defendants were deliberately indifferent to his plight in order to prevail on his Fourteenth Amendment claim. See Armstrong, 152 F.3d at 576 ("Specifically, the Court endorsed the use of the deliberately indifferent standard for cases in which the defendants have the luxury of forethought: 'As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical . . . ' The Court explained that prison is the quintessential setting for the deliberately indifferent standard because 'in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory . . . '") (internal citations omitted) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998)). Such proof at trial might include evidence of the duration of Davis's wrongful incarceration and the nature and frequency of his protests. In addition, Davis will undoubtedly attempt to prove that he brought the existence of his Judgment and Sentence Order to the attention of, at

minimum, Martin and Knell, and a jury could conclude that the other members of Davis's Farmington management team, Breedon, Prier, and Clyburn, were also aware of it. In the face of this knowledge, however, Davis will attempt to demonstrate that, instead of making any inquiries, the defendants either ignored Davis or reprimanded him for his "criminal thinking."

However, "whether the defendants' conduct constituted deliberate indifference is a classic issue for the fact finder." Armstrong, 152 F.3d at 577. Thus, while a deprivation of substantive due process technically requires proof of the requisite level of culpability, for purposes of our qualified immunity analysis, we cannot find as a matter of law that the defendants acted with deliberate indifference. See id.; cf. Cunningham v. City of Wenatchee, 345 F.3d 802, 806-07 (9th Cir. 2003), cert. denied, 124 S. Ct. 2070 (2004) ("Interlocutory appeals are not available when the appellate court is required to resolve a *fact*-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial. The officials must present the appellate court with a legal issue that does not require the court to consider the correctness of the plaintiff's version of the facts . . .") (internal quotations and citations omitted). For purposes of our qualified immunity analysis, it is enough that Davis has generated a fact question on the issue. Therefore, we turn now to the second portion of the qualified immunity analysis.

### B. Clearly Established

The second question that we must ask in our qualified immunity analysis is whether the constitutional right alleged to have been violated was clearly established. Saucier, 533 U.S. at 201. In order for a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989) (quotation omitted). In other words, a constitutional right

is clearly established when "it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." Saucier, 533 U.S. at 202. As we set forth above, our conclusion that the liberty interest of which Davis alleges he was deprived was clearly established at the time of the state defendants' actions. See McCurry v. Moore, 242 F. Supp. 2d 1167, 1178 (N.D. Fla. 2002) (finding right to be released upon expiration of sentence is clearly established and citing collection of cases); accord Sivard, 959 F.2d at 665-66 (continued detention where sheriff knew it was wrongful states claim under § 1983 for due process violation). Slone is on all fours with Davis's case and had been the law of our circuit for over half of a decade at the time of defendants' actions.

Based on Slone and the law of other circuits, see supra, we have no difficulty concluding that Davis alleged the deprivation of a clearly established right and that a reasonable government actor would know that failing to respond to Davis's requests to be released in keeping with the court order that he possessed was unlawful. The evidence viewed in the light most favorable to Davis shows that Martin and Knell had actual knowledge of the court order but failed to act. A reasonable jury could also conclude that Martin informed Breedon, Prier, and Clyburn of Davis's release order and that a reasonable person in their positions would know that their conduct in failing to act was unlawful.

However, as to defendant Atterberry, Davis attempts to hold her liable for failing to inquire about his sentencing status when he returned from St. Louis County without the requisite "court return" form. In her deposition, Atterberry testified that a significant percentage of prisoners who go out to court are not returned with a court return form because sometimes the county mails the form directly to the Department of Corrections. Under these circumstances, we cannot say that a reasonable person in Atterberry's shoes would know that failing to follow up on the significance of "1 YR DJS" contained on the transportation list and on the whereabouts of the court return form were unlawful. Unlike Knell, Martin, Breedon, Prier, and Clyburn, there

-27-

is nothing in the record to support an inference that Atterberry had actual or constructive knowledge of Davis's specific plight. See Garcia, 24 F.3d at 974 (Cudahy, J., concurring in part and dissenting in part) (recognizing there may be "haziness" as to "the exact contours of a duty to investigate" until "authorities *know* that they have no basis for detention"). She, therefore, is entitled to summary judgment.

## V. CONCLUSION

For the reasons stated above, we affirm the district court's denial of summary judgment based on qualified immunity to state defendants Knell, Martin, Breedon, Prier, and Clyburn. We find, however, that state defendant Atterberry is entitled to qualified immunity protection. We, therefore, reverse the district court's denial of summary judgment as to her. We deny the parties' request to exercise jurisdiction over the other issues raised in these consolidated appeals and remand this case for further proceedings consistent with this opinion.

_____