# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-4072

_____

| | | |
|---|---|---|
| David W. Sherbrooke, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| The City of Pelican Rapids, a | * | |
| Minnesota municipal corporation; | * | |
| Scott Fox, individually and in his | * | |
| capacity as Police Chief; Scott Sachs, | * | |
| individually and in his capacity as a | * | |
| Police Officer; Ted Leabo, individually | * | |
| and in his capacity as Police Officer, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: September 24, 2007
Filed: January 17, 2008

_____

Before COLLOTON, BEAM, and GRUENDER, Circuit Judges.

_____

COLLOTON, Circuit Judge.

David Sherbrooke filed this action pursuant to 42 U.S.C. § 1983, claiming that the City of Pelican Rapids, Minnesota, and several of its police officers violated his constitutional rights. Specifically, Sherbrooke alleged that the officers violated his rights under the Fourth Amendment by stopping his car without probable cause and

by recording one side of a conversation between Sherbrooke and his attorney. Sherbrooke also claimed that the officers committed several violations of state law, and alleged that the city was liable for maintaining an unconstitutional policy.

The district court dismissed most of Sherbrooke's claims, but denied the defendants' motion for summary judgment on the claim relating to the traffic stop. The court also granted summary judgment for Sherbrooke on the claim concerning the recording of his statements during a telephone call with his attorney. The police officers and police chief appeal the district court's denial of qualified immunity, and the city appeals the court's denial of its motion for summary judgment. We reverse and remand.

I.

On the night of July 24, 2004, Sherbrooke attended a high school class reunion at the Veterans of Foreign Wars hall in Pelican Rapids. At the reunion, Sherbrooke drank several alcoholic beverages before driving his pickup truck back to his lake house at about 12:25 a.m. Along the way, Sherbrooke pulled over to the side of Minnesota Highway 59 to look up a telephone number. While parked along the side of the highway, Sherbrooke activated his hazard lights to alert passing traffic that he had pulled over.

After finding the telephone number and completing a telephone call, Sherbrooke pulled away from the shoulder and continued driving down the highway. Sherbrooke testified that a police vehicle was parked at a stop sign "about 1,100 feet" up the road and around a bend from where Sherbrooke had pulled over. Officer Scott Sachs was in the squad car, performing patrol work. Sherbrooke testified that he turned off the hazard lights when his vehicle reached the 55 mile-per-hour speed limit, which, he says, "is the correct way to do it." At the same time, Sherbrooke conceded that he turned his hazard lights off about 200 yards before reaching Sachs's police

vehicle, and only after noticing that Sachs's car was a police vehicle. Upon seeing the police vehicle, Sherbrooke gathered his thoughts, checked his speed, and noticed that his hazard lights remained on.

After seeing Sherbrooke drive by, Officer Sachs pulled out behind Sherbrooke, followed him for about twenty-five seconds, and then signaled to Sherbrooke to pull over. Sherbrooke testified that by the time Officer Sachs pulled him over, the hazard lights had been deactivated. After pulling to the side of the road, Sherbrooke got out of his truck, but Officer Sachs ordered him back into the vehicle. Sherbrooke testified that Sachs then waited four minutes before approaching Sherbrooke's truck. Sherbrooke later alleged that he was pulled over because Sachs was involved in a contest with other officers to see who could make the most arrests for driving while intoxicated.

During the traffic stop, Officer Sachs detected alcohol on Sherbrooke's breath and looked for signs of impairment. After conducting a series of field sobriety tests and a portable breath test, Sachs arrested Sherbrooke for drunk driving and transported him to the police department for additional testing.

At the police station, Sherbrooke consented to another, more accurate breath test called an Intoxilyzer. Pursuant to the standard operating procedure of the police department, Sherbrooke remained under video and audio surveillance so that the officers could monitor his food and water intake prior to administering the test. During the wait, Sherbrooke called his attorney and spoke to him while Sachs and another officer (defendant Ted Leabo) remained in the room. After speaking to his attorney, Sherbrooke took the Intoxilyzer test, which revealed that his blood alcohol level exceeded the legal limit for driving. Sherbrooke contends that Sachs caused Sherbrooke to drink warm water before the test, and then improperly administered the test, thus resulting in an artificially high reading. Sherbrooke then requested a blood test. The blood test, administered at a nearby hospital, was not admissible in court.

The charges against Sherbrooke eventually were dropped, and he was never prosecuted.

Sherbrooke brought this suit for damages, alleging violations of his constitutional rights, as well as "mental anguish, pain and suffering and humiliation." The district court dismissed most of his claims, but denied the defendants' motion for summary judgment on Sherbrooke's claim that the initial traffic stop was an unlawful seizure. The court also granted summary judgment for Sherbrooke on his claim that the officers unlawfully recorded one side of the telephone conversation with his attorney. The officers and the city filed this interlocutory appeal.

II.

As a preliminary matter, Sherbrooke challenges our jurisdiction over this appeal. We have jurisdiction to consider an interlocutory appeal of an order denying qualified immunity to the extent the appeal seeks review of "purely legal determinations made by the district court." *Wilson v. Lawrence County, Mo.*, 260 F.3d 946, 951 (8th Cir. 2001). We do not have jurisdiction to consider "which facts a party may, or may not, be able to prove at trial," *Johnson v. Jones*, 515 U.S. 304, 313 (1995), but the city and the police officers do not bring this sort of fact-based appeal. Their contention is that even taking the facts in the light most favorable to Sherbrooke, neither the traffic stop nor the recording of Sherbrooke's statements violated Sherbrooke's clearly established rights under the Fourth Amendment. This is a purely legal question over which we have jurisdiction. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Dible v. Scholl*, 506 F.3d 1106, 1109 (8th Cir. 2007). We also have jurisdiction to consider the district court's grant of partial summary judgment in favor of Sherbrooke, because it turns on the very same legal issue as the denial of qualified immunity – that is, whether the recording of Sherbrooke's conversation with his attorney violated the Fourth Amendment. *See Smith v. Ark. Dept. of Corrections*, 103 F.3d 637, 650 (8th Cir. 1996). And we have jurisdiction to consider the City's

appeal of the denial of summary judgment on Sherbrooke's allegation that a municipal policy caused a violation of his constitutional rights, because the merits of the City's appeal is inextricably intertwined with the question whether the officers violated Sherbrooke's rights. *Smook v. Minnehaha County*, 457 F.3d 806, 813 (8th Cir. 2006), *cert. denied*, 127 S. Ct. 1885 (2007).

In assessing a claim of qualified immunity, we are required first to ask whether the plaintiff's allegations establish a violation of the Constitution. *Saucier*, 533 U.S. at 201. If so, then we "ask whether the right was clearly established" at the time of the violation. *Id.* "To defeat a claim of qualified immunity, the contours of an alleged constitutional right must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Smook*, 457 F.3d at 813 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Sherbrooke's first claim at issue on appeal is that Officer Sachs violated the Fourth Amendment by stopping Sherbrooke's truck. Sachs argues that the seizure was constitutional because an objectively reasonable officer could have stopped the vehicle either to exercise a community caretaking function, *see Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), or to investigate a traffic violation for which there was probable cause. As to the latter, probable cause that a driver has committed any traffic violation, no matter how minor, provides sufficient justification under the Fourth Amendment to stop a vehicle. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). The officer's subjective motivation is irrelevant. *Brigham City v. Stuart*, 126 S. Ct. 1943, 1948 (2006). Even if the officer was influenced by an impermissible motive, a traffic stop does not violate the driver's rights under the *Fourth Amendment* to be free from unreasonable seizures, as long as the circumstances, viewed objectively, justified the seizure. *Id.*; *Whren v. United States*, 517 U.S. 806, 813 (1996).

Minnesota law prohibits the use of flashing lights on a vehicle except in limited circumstances, including "as a means of indicating a right or left turn, or the presence of a vehicular traffic hazard requiring unusual care in approaching, overtaking, or passing." Minn. Stat. § 169.64. Sherbrooke contends that his use of the flashers on his truck was permissible under the quoted exception, because he used his lights as a proper means of indicating that his vehicle presented a "vehicular traffic hazard." His rationale is that when a vehicle enters a roadway from a stopped position on the shoulder, the vehicle presents a vehicular traffic hazard until such time as the vehicle reaches the speed limit (in this case, fifty-five miles per hour), and that use of the flashers is thus permissible until that speed is attained.

We disagree with Sherbrooke's interpretation of the Minnesota statutes. The posted speed limit is evidence of only the *maximum* speed that is reasonable and prudent on a roadway. Minn. Stat. § 169.14(2). There is no legal requirement that a vehicle ever reach that speed. Vehicles may operate lawfully at reasonable and prudent speeds below the maximum without constituting a vehicular traffic hazard. Assuming Sherbrooke is correct that a vehicle may lawfully use its flashers to indicate a traffic hazard when the vehicle *first enters* a roadway in Minnesota, use of the flashers should cease when the vehicle reaches a speed that no longer presents a hazard. A reasonable officer surely could believe that speeds close to, but less than, the maximum posted limit present no traffic hazard. Sherbrooke concedes that he was using his flashers until he reached the maximum speed limit of fifty-five miles per hour. Because the speed of the vehicle during the preceding moments, when the vehicle was traveling slightly under the speed limit, presented no apparent traffic hazard, Officer Sachs had probable cause to stop Sherbrooke for improper use of flashing lights. **We think the alternative interpretation of the statute apparently endorsed by the partial dissenting opinion – that highway drivers may use flashing lights whenever accelerating from reasonable and prudent speeds below the maximum (say, fifty to fifty-four miles per hour) up to the speed limit of fifty-five miles per hour – more nearly "defies common sense" than does ours.** *Cf. post* at 13-14.

Alternatively, even accepting Sherbrooke's interpretation of the statutes for the sake of argument, we conclude that an objectively reasonable officer in Sachs's position had probable cause to stop Sherbrooke's truck for improper use of flashing lights. It is undisputed that Sachs did not observe Sherbrooke at the point when he was stopped at the side of the road to use the telephone before pulling back on to Highway 59. By Sherbrooke's own testimony, the distance from where Sherbrooke pulled off the road to Sachs's location was 1,100 feet, but Sherbrooke could not observe Sachs (and vice-versa) until after Sherbrooke came around a curve on the highway, at a distance between 600 and 900 feet from Sachs's squad car. (Sherbrooke Dep. 59, Appellant's App. A-33). Thus, even assuming it was permissible for Sherbrooke to operate his flashers from the time he reentered the highway until his vehicle reached fifty-five miles per hour, and even assuming any reasonable officer would have been expected to know that interpretation of the statute was correct, a reasonable officer in Sachs's position would not have known that Sherbrooke recently reentered the roadway. From his location, Sachs simply observed Sherbrooke's vehicle come around the curve with its flashing lights activated. A reasonable officer in those circumstances had probable cause to believe that Sherbrooke was in violation of the prohibition on flashing lights in Minn. Stat. § 169.64, because there was no apparent vehicular traffic hazard. Even if Sherbrooke, unbeknownst to Sachs, actually was using his flashers to alert other drivers after reentering the road from a stopped position, a law enforcement officer does not violate the Fourth Amendment if he seizes a suspect under the reasonable, but mistaken, belief that the suspect committed an offense. *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005).

For these reasons, we conclude that Officer Sachs had probable cause to stop Sherbrooke for improper use of flashing lights. Accordingly, Sachs did not violate Sherbrooke's constitutional rights under the Fourth Amendment, and Sachs's motion for summary judgment on this point should have been granted. In view of our conclusion regarding probable cause, we need not consider whether the seizure also was justified by the officer's exercise of his community caretaking function.

Sherbrooke's second claim at issue on appeal relates to his telephone call to his attorney while in custody. The police in Pelican Rapids had a standard operating procedure of making an audio and video recording of detainees who were awaiting an Intoxilyzer test, with the stated purpose of preventing any action that would call into question the validity of the ensuing test. The officers investigating Sherbrooke activated the recording equipment in accordance with this procedure, so Sherbrooke's speech was recorded while he was in the police station. Before taking the breath test, while in the presence of Officers Sachs and Leabo, Sherbrooke called his attorney to ask for legal advice. Sherbrooke's end of this telephone call was recorded by the equipment that was already activated.

The district court held that the act of recording Sherbrooke's speech during the telephone conversation with his attorney was an unconstitutional search. We disagree, because Sherbrooke had no reasonable expectation of privacy in what he said during this call. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). Sherbrooke placed this telephone call in an open room, in which the presence of police officers was open and obvious. The tape recording even shows that Sherbrooke acknowledged, near the end of the conversation, that his statements were being recorded, and that this was "fine" with him. Under these circumstances, Sherbrooke could not reasonably expect that the conversation was private, and there was no search within the meaning of the Fourth Amendment. *See United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003); *United States v. Gann*, 732 F.2d 714, 723 (9th Cir. 1984). That communications between an attorney and client generally are privileged when conducted privately does not mean that a conversation knowingly conducted in the presence of others is privileged or private. Sherbrooke's contention that the police allegedly prevented him from placing a private call to his attorney is properly addressed, if at all, under constitutional provisions other

than the Fourth Amendment. *Cf. Friedman v. Comm'r of Public Safety*, 473 N.W.2d 828, 835 (Minn. 1991).[1]

The City's appeal is inextricably intertwined with the appeal of the police officers. Because the police officers did not violate Sherbrooke's constitutional rights under the Fourth Amendment, there can be no municipal liability under the Fourth Amendment for an unconstitutional policy. *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005). Accordingly, the City is also entitled to summary judgment on that claim.

\* \* \*

For the foregoing reasons, we reverse the district court's orders denying the officers' motions for summary judgment based on qualified immunity, denying the City's motion for summary judgment, and granting in part Sherbrooke's motion for summary judgment. The case is remanded for further proceedings consistent with this opinion.

BEAM, Circuit Judge, concurring in part and dissenting in part.

As the panel majority notes, a police officer may legitimately detain the operator of a motor vehicle if he observes even a minor traffic offense. United States v. Eldridge, 984 F.2d 943, 948 (8th Cir. 1993). But it is equally clear that the Fourth Amendment establishes an absolute right for a motorist to be free from a pretextual traffic stop. Id. at 947. Such a stop occurred in this case, possibly because Officer Sachs and other members of the Pelican Rapids Police Department were engaged in a contest to see which officer could make the most driving-while-intoxicated (DWI)

---

[1]Sherbrooke also alleged that the recording violated his rights under the Fifth and Sixth Amendments to the Constitution of the United States, but the district court dismissed those claims.

stops that particular weekend. Accordingly, I dissent from the court's reversal of the district court and the court's grant of qualified immunity to Officer Sachs.

**I.**

"We review a district court's qualified immunity determination on summary judgment de novo." Davis v. Hall, 375 F.3d 703, 711 (8th Cir. 2004). "This standard of review requires us to view the summary judgment record in the light most favorable to [Sherbrooke], and to afford him all reasonable *inferences* to be drawn from that record." Id. (emphasis added). Under this approach, the facts are slightly different from those adopted by the court in its opinion.

As Mr. Sherbrooke was returning home from his class reunion, he pulled off the improved portion of Minnesota Highway 59 onto the side of the road. He parked for a short period of time to look up a telephone number and to make a call. During this stop, he activated his flashing hazard lights to alert traffic moving along the highway. Sometime during Sherbrooke's pause, Sachs pulled up to a stop sign on a road intersecting Highway 59 ahead of Sherbrooke's line of travel. Sachs' vehicle remained in this position until Sherbrooke had returned to the paved portion of the roadway and passed along Highway 59 in front of him. Sachs could not see Sherbrooke's stopped vehicle with its lights flashing from his position at the sign. Sherbrooke testified that he later measured the distance between the place at which he stopped and the location of Sachs' police car at the stop sign and it was 1100 feet, his measuring device being within "two percent" accurate. Appellants' Appendix at 33. He further testified that the line of sight between the vehicles was 900 feet, saying "you just get going a little bit because its on a curve . . . [a]nd then you can see." Id. Sherbrooke also testified that he re-entered the highway with his lights flashing, accelerated up to the posted speed limit of 55 miles-per-hour and then turned off his hazard lights. Id. at 32. According to his testimony, he was 400 feet from Sachs' waiting vehicle when he turned off his hazard lights, and it was not until reaching this point that he could see

-10-

that the stopped vehicle was a police car. Id. at 33. Thus, as Sherbrooke accelerated from the road-side stop to a speed of 55 miles-per-hour over a total distance of 700 feet, Officer Sachs observed Sherbrooke traveling with hazard lights flashing over a distance of no more than 500 feet. Given a speed conversion of one mile-per-hour equals 1.47 seconds, Officer Sachs could have observed Mr. Sherbrooke traveling along the highway with his hazard lights on for no more than eight to fifteen seconds and probably less.

## II.

The court contends that a reasonable police officer under the same circumstances was entitled to find that Sherbrooke was violating Minnesota Statute § 169.64, subdivision 3, the only statutory section dealing with use of flashing hazard lights. I disagree.

At the outset, I note that the court slightly glosses the facts to create subtle evidentiary inferences in favor of Sachs, a clear violation of binding precedent. Davis, 375 F.3d at 711. Even without this approach, the court's statutory interpretation is off the mark.

Section 169.64, subdivision 3, provides, in pertinent part:

Flashing lights. Flashing lights are prohibited, except on . . . any vehicle as a means of indicating . . . the presence of a vehicular traffic hazard requiring unusual care in approaching, overtaking, or passing.

So far as I can determine, Minnesota courts have construed this subdivision of the statute only once. Dawydowycz v. Quady, 220 N.W.2d 478 (Minn. 1974) indicates that operating a vehicle at reduced speed in the presence of a traffic hazard is both permitted and required by section 169.64, subdivision 3. Id. at 480 (under this

-11-

section, a flashing light indicates the presence of a traffic hazard requiring reduced speed). When a motor vehicle proceeds at night from a stopped position on the road shoulder onto a paved state highway with a 55 mile-per-hour maximum speed limit, as in this case, it is inconceivable that the court can quarrel with the idea that an "approaching, overtaking, or passing" hazard exists by virtue of the operation or possible operation of other moving vehicles using or potentially using the same highway at the same time, and I do not necessarily read the court's opinion as doing so. Any evaluation of the existence of a hazard, or not, must involve *both* the vehicle proceeding from a stopped position with flashing lights and the use or contemplated use of the same traveled portion of the roadway by other vehicles, especially when the roadway has curves, as here, that tend to reduce lines of vision between traveling, approaching, overtaking and passing vehicles.

Notwithstanding, the court focuses only on Sherbrooke's truck and reaches the unusual and, in my view, unsupportable conclusion that the instant his slower-moving motor vehicle reached a "reasonable and prudent speed[]," whatever speed that may have been, any traffic hazard automatically abated and it became unlawful for him to continue to operate the flashing lights. Ante at 6. Such speed, says the court, will always be less than the posted maximum speed. Ante at 6.

This idea turns a proper interpretation of section 169.64, subdivision 3, on its head. And, the record indicates that Officer Sachs must have thought so as well. He testified that he stopped Sherbrooke, not because he was violating subdivision 3, but because upon seeing the flashing hazard lights in operation, he exercised his community caretaker obligation to see if Sherbrooke or a passenger might need help. Appellants' Appendix at 70. Sachs' later actions, as clearly enunciated in the record, totally undermine any argument that the stop was actually an exercise of this caretaker obligation. For this reason, the court properly disregards this claim by Sachs.

-12-

The court's construction of section 169.64, subdivision 3 defies common sense,[2] disregards the rules of statutory interpretation, ignores studies of motor vehicle operation and places the statute's meaning in the hands of the police officers charged with enforcing, not interpreting, the law. Any assumption by a driver in Sherbrooke's shoes that an overtaking motorist, possibly exceeding the posted speed limit, needs warning that there is an accelerating vehicle in the roadway, is, according to the court's rationale, a traffic violation. With this result I disagree. Under the undisputed facts here, "reasonable and prudent" driving required continuing, not less, warning.

Minnesota law permits a driver to stop and park beside a paved highway so long as the vehicle is off of the improved portion of the road. Minn. Stat. § 169.32(a). So, Sherbrooke violated no traffic regulation when he stopped to make the telephone call. And, as the court states, there is no legal requirement that a vehicle ever reach the maximum-posted speed. Ante at 6. This is correct, of course, because in Minnesota, absent the presence of a special hazard, any speed not in excess of a posted maximum is reasonable and prudent. Minn. Stat. § 169.14, subd. 2(3). But as Dawydowycz notes, section 169.64, subdivision 3, requires that the speed of traveling, approaching, overtaking or passing vehicles be reduced in the presence of a traffic hazard. 220 N.W.2d at 480. Thus, when Sherbrooke moved from his stop onto the paved portion

---

[2]The court takes issue with my characterization of its interpretation of the statute. Cf. ante at 6. I continue to believe my analysis appropriate in the circumstances of this case. I agree with the court that "[v]ehicles may operate lawfully at reasonable and prudent speeds below the maximum without constituting a vehicular traffic hazard." In the abstract, they can, of course. But, that is not the issue here. The issue is whether Sherbrooke violated section 169.64 by operating hazard flashers at speeds up to 55 miles-per-hour on Route 59 while accelerating from a stop when, as shown by Minnesota studies, up to 75 percent of overtaking vehicles will almost certainly be exceeding the speed limit. Common sense indicates that a traffic hazard continues to be presented under such circumstances and Sherbrooke was not violating the law.

of Highway 59, subdivision 3 not only permitted him to operate his hazard lights but the Minnesota Supreme Court's reasoning in <u>Dawydowycz</u> required him to do so. And, subdivision 3 permitted him to continue to do so at least until his vehicle had reached the prudent velocity of any conceivable overtaking traffic.

In 1997, a national survey of speeding and other unsafe driving activities was commissioned by the United States Department of Transportation. More than one in five respondents to that survey (23 percent) admitted they had driven at least ten miles over the posted speed limit on an interstate highway within the past week. *See* U.S. Dep't of Transp., National Survey of Speeding and Other Unsafe Driving Activities, Vol. II: Driver Attitudes and Behaviors: Executive Summary, *available at* http://www.nhtsa.dot.gov/people/injury/aggressive/unsafe/att-beh/Chapt1-2.html.

Additionally, speeding is a significant contributing factor in many fatal accidents. For example, in the state of Minnesota, "illegal or unsafe speed was a contributing factor in 764 fatal crashes resulting in 843 deaths" between 2002 and 2006. Minn. Dep't of Public Safety, Office of Traffic Safety, 2006 Minnesota Speeding Facts, *available at* http://www.dps.state.mn.us/ots/enforcement_programs/ default.asp. A study conducted by the Minnesota Transportation Department "showed that 75 percent of the vehicles surveyed in 55-mph zones were speeding, the highest rate among reporting states that conducted similar surveys for the federal government." Robert Whereatt, <u>Senate committee defeats attempt to eliminate loophole in speed law</u>, Star Tribune, Mar. 31, 1989, at 4B.

With these studies in mind, it is clear that a driver entering upon an improved highway at a reduced speed creates a temporary hazard for other traffic that may be in the area, allowing the prudent use of flashing hazard lights, at least until the vehicle reaches the posted maximum speed limit. Accordingly, Sherbrooke's actions complied with any reasonable interpretation of section 169.64, subdivision 3.

The further and alternative idea expressed by the court is that an officer observing a vehicle "come around the curve with its flashing lights activated" may reasonably (even mistakenly) believe that the vehicle operator is violating section 169.64, subdivision 3. Ante at 7. Standing along, this is an even more untenable holding. Indeed, if this is a correct expression of the law under the circumstances of this case, it is hard to imagine any situation, no matter how unlikely, that would not support a police officer's detention of a passing motorist. The court seems to be saying that a reasonable officer may jump to almost any conclusion, even a mistaken one, and use the circumstance to make a lawful arrest or detention. There is no precedent for this argument.

The court cites United States v. Smart, 393 F.3d 767 (8th Cir. 2005) in support of its contention. But Smart is so factually off the mark here that it is totally inapposite. The validity of a stop depends upon whether it is objectively reasonable in the circumstances. Id. at 770. Thus, there needed to be a reasonable evidentiary predicate for the creation of an "objectively reasonable basis [for stopping Sherbrooke's] vehicle." Id. In Smart an Iowa police officer observed Smart driving a motor vehicle in Iowa without a front license plate. Iowa law, of course, requires the display of two license plates. The officer also knew that other states permitted operation with but one plate, but he did not remember which states nor could he discern the state of issue of the plate on Smart's car. So, the officer stopped Smart to make this determination. It turned out to be a Georgia plate on a validly registered Georgia automobile, a state that requires but one plate. Thus, the officer was reasonably mistaken under the circumstances permitting a valid stop.

In an attempt to apply Smart in support of Sachs' motion, the court bifurcates (or, perhaps, trifurcates) the undisputed material facts, isolating a 500-feet portion of the roadway evidence while totally disregarding the balance of the proof. But, to the contrary, Sherbrooke is entitled to even-handed consideration of all material facts, not just those purportedly beneficial to the court's argument on behalf of Sachs. And,

Sherbrooke is, likewise, entitled to all favorable inferences that may be gleaned from all of the material evidence in the record.

There were simply no violations of state law here. The stop of Sherbrooke by Sachs was a pretext for making another DWI arrest that weekend. While the outcome at trial is another matter, a trial is nonetheless required on this issue.

I concur in the balance of the court's opinion. I dissent from its finding (or mistaken finding) of a violation of Minnesota Statute § 169.64, subdivision 3, and would affirm the district court's denial of qualified immunity on that discrete issue.

_____