# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2060

_____

Stephen James Engleman,

        Appellee,

    v.

Deputy Murray,

        Appellant,

Chief of Police Keith Smith, Gentry
Police Department,

        Defendant.

\* Appeal from the United States
\* District Court for the
\* Western District of Arkansas.

_____

Submitted: January 14, 2008
Filed: November 17, 2008

_____

Before BYE, BEAM and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Stephen James Engleman brought this 42 U.S.C. § 1983 claim against "Deputy Murray"[1] of the Benton County Sheriff's Office, alleging that the Arkansas deputy

---

[1]Neither the record nor the parties reveal Deputy Murray's first name.

violated Engleman's Fourth Amendment rights by arresting him in Oklahoma on an Arkansas warrant. The district court denied Deputy Murray's motion for summary judgment based on qualified immunity, and Deputy Murray brought an interlocutory appeal. For the reasons discussed below, we reverse.

## I. BACKGROUND

On January 11, 2005, Engleman dialed 911, and his call was routed to the Benton County Sheriff's Office in Arkansas. Caller identification on the 911 system indicated that Engleman made the call from his parents' home at 24512 Van Fleet Road, Siloam Springs, Arkansas, from a telephone number containing a 479 area code, which is assigned to phone numbers in northwestern Arkansas. He reported three prowlers at 24512 Van Fleet Road and instructed officers to travel north on Highway 43 (an Arkansas road that runs from downtown Siloam Springs to Van Fleet Road) before turning west onto Van Fleet Road.

Benton County Deputy Sheriff Murray and a Gentry, Arkansas, police officer responded to the call. During the course of responding to Engleman's request for assistance, the officers were informed of an outstanding warrant for Engleman's arrest.[2] Engleman's father greeted the officers, who told him that they had a warrant for Engleman's arrest. When they explained that the warrant was issued in Bentonville, Arkansas, Engleman's father stated that they were in Oklahoma. The

---

[2]According to a release report from the Benton County Sheriff's Office, on September 27, 2003, Engleman had been arrested at 24512 Van Fleet Road for domestic battery, possession of drug paraphernalia, terroristic threatening and false imprisonment. The report identified his address as an Arkansas address and his telephone number as having the 479 Arkansas area code. The report also stated that Engleman had an Arkansas driver's license. These charges were dismissed in January 2004, but two other charges, failure to appear and failure to comply, remained outstanding. A Bentonville District Court judge issued a warrant for Engleman's arrest based on these two outstanding charges.

officers wanted to speak with Engleman, and his father replied that he was in the house. The officers then entered the house to look for Engleman.

As they entered the house, Engleman hid in a closet in the garage. Two more Benton County deputy sheriffs arrived, and a deputy sheriff said to the other officers that he could see Engleman's foot underneath a crack in the door. Engleman left the closet, and officers told him to stop because he was under arrest. Engleman ignored the command and attempted to flee through the back door of the garage, which was locked. Officers again told him he was under arrest, and Engleman said that they could not arrest him because he was in Oklahoma. After a scuffle, the officers restrained him. His mother told the officers that they were in Oklahoma as they handcuffed Engleman. While two officers took Engleman to a squad car, Engleman claimed that a similar event had happened last year and his parents had proof that they were in Oklahoma. An unnamed deputy sheriff allegedly responded, "We got away with it once." Deputy Murray drove Engleman to the Benton County Jail, where he was booked and released that day.

Engleman sued Gentry Police Chief Keith Smith, Benton County Sheriff Keith Ferguson and Deputy Murray under 42 U.S.C. § 1983, alleging that the officers who arrested him used excessive force in violation of the Fourth Amendment and that the arrest in Oklahoma was unreasonable under the Fourth Amendment. During the course of litigation, a Global Positioning System map revealed that the house at 24512 Van Fleet Road was physically located in Oklahoma, and the parties agree that the Englemans' mailbox is located in Arkansas. The defendants moved for summary judgment, arguing that they were entitled to qualified immunity. The magistrate judge, acting pursuant to the district court's designation under 28 U.S.C. § 636(b), recommended granting the defendants' motions. He concluded that neither Smith nor Ferguson was involved in the arrest and that Engleman had not alleged that they failed to train properly or supervise their employees. He also concluded that Deputy Murray did not use excessive force and that the seizure was reasonable, and he recommended

granting Deputy Murray qualified immunity. The district court denied Deputy Murray's motion for summary judgment on the unreasonable seizure claim, concluding that Deputy Murray was not entitled to qualified immunity, but adopted the remainder of the report and recommendation. Deputy Murray brings this interlocutory appeal from the denial of qualified immunity.

## II.    DISCUSSION

Engleman claims that in arresting him in Oklahoma on an Arkansas warrant, Deputy Murray exceeded his jurisdictional authority, which violated Engleman's Fourth Amendment right to be free from unreasonable seizures. Deputy Murray argues that he is entitled to qualified immunity for the alleged Fourth Amendment violation because it was objectively reasonable to believe that he was arresting Engleman in Arkansas.

The question of qualified immunity is one of law for the court. *Littrell v. Franklin*, 388 F.3d 578, 584 (8th Cir. 2004). "We review a district court's qualified immunity determination on summary judgment de novo." *Davis v. Hall*, 375 F.3d 703, 711 (8th Cir. 2004). We view the record in the light most favorable to Engleman and draw all reasonable inferences in his favor. *See id.* In resolving a qualified immunity claim, we first ask whether Engleman's allegations establish a constitutional violation. *See Sherbrooke v. City of Pelican Rapids*, 513 F.3d 809, 813 (8th Cir. 2008). "Then we ask whether the right was clearly established at the time of the violation." *Id.* (internal quotation omitted). "To defeat a claim of qualified immunity, the contours of an alleged constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Smook v. Minnehaha County*, 457 F.3d 806, 813 (8th Cir. 2006), *cert. denied*, 549 U.S. ---, 127 S. Ct. 1885 (2007) (internal quotation omitted). "Whether an official's conduct was objectively reasonable is a question of law." *Ripson v. Alles*, 21 F.3d 805, 808 (8th Cir. 1994) (quotation omitted). "If a plaintiff fails to assert a constitutional

violation under the law as currently interpreted or if the actions that the plaintiff alleges the defendant to have taken are actions that a reasonable officer could have believed lawful, the defendant is entitled to dismissal." *Id.* However, a claim of "qualified immunity would be defeated if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (quotation, alteration and emphasis omitted).

To avoid summary judgment based on qualified immunity, Engleman must proffer sufficient evidence to raise a genuine issue of material fact about whether a reasonable officer would have known that Deputy Murray's conduct violated a clearly established right. *See Hill v. Scott*, 349 F.3d 1068, 1071 (8th Cir. 2003). While we view the facts in the light most favorable to Engleman, we must only take as true those assertions properly supported by the record. *See Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001). If, taking the facts in the light most favorable to Engleman, we find that there are no material issues of fact and Deputy Murray's actions were objectively reasonable in light of the law and the information he possessed at the time, Deputy Murray is entitled to qualified immunity as a matter of law. *See Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 667 (8th Cir. 1992); Fed. R. Civ. P. 56(c). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis*, 375 F.3d at 712 (internal quotation omitted).

Engleman concedes that the Arkansas arrest warrant was valid and supported by probable cause. Arkansas law authorizes law enforcement officers to execute its arrest warrants "in any county in the state" but does not authorize out-of-state arrests. Ark. Code Ann. § 16-81-105. Deputy Murray cites no Oklahoma authority that would permit an Arkansas officer to effect an arrest on an Arkansas warrant in Oklahoma. *Cf. Stuart v. Mayberry*, 231 P. 491, 494 (Okla. 1924) (concluding that warrant issued in Oklahoma had no effect in Kansas). Nevertheless, we are mindful that the Fourth Amendment is not "a redundant guarantee of whatever limits on search and seizure

-5-

legislatures might have enacted." *Virginia v. Moore*, 553 U.S. ---, 128 S. Ct. 1598, 1602 (2008). Therefore, "[i]n determining whether a search or seizure is unreasonable, we begin with history." *Id.* "When history has not provided a conclusive answer, we have analyzed a search or seizure in light of traditional standards of reasonableness . . . ." *Id.* at 1604.[3]

At the time the Bill of Rights was adopted, a warrant issued in one English county was not valid in another county unless a justice of the peace in that county "backed" the warrant. *See* William Blackstone, 4 Commentaries *292. "[W]hen a warrant is received by the officer he is bound to execute it, so far as the jurisdiction of the magistrate and himself extends." *Id.* at *291; *see Blatcher v. Kemp*, (1782) 126 Eng. Rep. 10, 10 n.a (Maidstone Assizes) ("No constable can act under a warrant, out of his district . . . ."); *R v. Chandler*, (1700) 91 Eng. Rep. 1264, 1265 (K.B.) ("[W]here a precept or warrant is directed to men by the name of their office, it is confined to the districts in which they are officers."). Under a historical understanding of the Fourth

---

[3]We recognize that our precedents have reflected conflicting views with respect to the relevance of state law in a Fourth Amendment analysis. *Compare Bissonette v. Haig*, 800 F.2d 812, 815 (8th Cir. 1986) (en banc) ("Not only federal law, but also state law, can be relevant in determining what is reasonable under the Fourth Amendment."), *and Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994) (concluding that the test for objective reasonableness includes "the fact that the officer lacked authority under state law to make the arrest"), *with United States v. Bell*, 54 F.3d 502, 504 (8th Cir. 1995) ("A federal court generally does not look to state statutes to assess the validity of an arrest . . . under the Fourth Amendment."). The Supreme Court has recently advised that "state law [does] not alter the content of the Fourth Amendment." *Moore*, 128 S. Ct. at 1604. While *Bissonette* and *Abbott* relied in part on state law to determine whether a search or seizure was reasonable under the Fourth Amendment, we are now instructed to examine "history" and "traditional standards of reasonableness" without "linking Fourth Amendment protections to state law." *Id.* at 1604, 1607; *see also Rose v. City of Mulberry*, 533 F.3d 678, 680 (8th Cir. 2008) (recognizing that "[w]hatever the state of our circuit law has been on this question," we look at reasonableness in light of *Moore*).

Amendment, the jurisdiction of the issuing judge and the executing officer is limited, and a warrant is not valid if an officer acts outside of that limited jurisdiction. *See Lawson v. Buzines*, 3 Del. (3 Harr.) 416, 416 (Sup. Ct. 1842) (concluding that "a constable of the city . . . has no authority out of the city limits" to execute an arrest warrant issued in that county); *Copeland v. Isley*, 19 N.C. (2 Dev. & Bat.) 505, 505 (1837) ("[A]n officer must proceed to arrest at some place actually in his own county . . . ."). Moreover, the Constitution explicitly provides a procedure for extradition between states, suggesting that an officer from one state may not simply cross into another state to arrest an individual. *See* U.S. Const. art. IV, § 2 ("A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.").

Notwithstanding the historical prohibition on executing an arrest warrant outside of the arresting officer's jurisdiction, we conclude that Deputy Murray is entitled to qualified immunity because it was objectively reasonable for an officer in Deputy Murray's position to have believed that he was executing the arrest in Arkansas. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). We look "at the totality of the circumstances surrounding the arrest to determine its reasonableness." *Scott*, 349 F.3d at 1073. Officers can make objectively reasonable mistakes about which premises a warrant authorizes them to search, *Maryland v. Garrison*, 480 U.S. 79, 87-88 (1987), which individual an arrest warrant names, *Hill v. California*, 401 U.S. 797, 804 (1971); *Scott*, 349 F.3d at 1074 (8th Cir. 2003), and even in which jurisdiction they are acting, *Pasiewicz v. Lake County Forest Preserve District*, 270 F.3d 520, 527 (7th Cir. 2001). The "objective facts available" to Deputy Murray at the time would lead a reasonable officer to believe he was arresting Engleman in Arkansas. *See Garrison*,

480 U.S. at 88. The 911 system identified Engleman's call as originating from a telephone number with an Arkansas area code and a Siloam Springs, Arkansas, address. The call was routed by the system to the Benton County Sheriff's Office, and Benton County deputy sheriffs were summoned to a location with an Arkansas mailing address. Engleman provided directions to travel north along Highway 43 (from the direction of downtown Siloam Springs, Arkansas) and then west on Van Fleet Road. The arrest warrant had been issued in Arkansas and stated that Engleman resided at 24512 Van Fleet Road in Arkansas. Based on these facts at Deputy Murray's disposal, we conclude that it was objectively reasonable as a matter of law for an officer to believe he was arresting Engleman in Arkansas.[4]

Engleman argues that Deputy Murray should have known he was making an arrest in Oklahoma in violation of the Constitution. He first points to the fact that he, along with his mother and father, told the officers they were in Oklahoma. The protests of a resisting arrestee generally do not make an objectively reasonable arrest unreasonable. *See Hill*, 401 U.S. at 803 ("[A]liases and false identifications are not uncommon."); *see also Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."); *cf. Baker v. McCollan*, 443 U.S. 137, 145 (1979) (finding that plaintiff only raised a false imprisonment state law claim and that failure to investigate assertions of mistaken identity did not violate due process). In addition to all of the objective evidence suggesting that Deputy Murray was executing the arrest warrant in Arkansas, Engleman's father only revealed that they were in

---

[4]The Supreme Court has clearly stated that in establishing qualified immunity, the test must be applied at a level of specificity that approximates the actual circumstances of the case. *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987). The district court failed to do so here, instead analyzing the issue at a level of generality that did not account for the particularized circumstances by noting only that "there is no question that a reasonable official would know that an unauthorized arrest – i.e., an arrest by a police officer outside that police officer's jurisdiction – would amount to a violation of an individual's right to be free from unreasonable seizure."

Oklahoma after the officers stated they had an arrest warrant for Engleman. Engleman hid in a closet in the garage to evade the officers, attempted to flee and was repeatedly commanded to stop before he insisted that they were in Oklahoma. Engleman's mother only told them that they were in Oklahoma after Engleman had been arrested. Furthermore, there is no evidence that Engleman's arrest was a planned and considered event before which Deputy Murray might have had the opportunity to fully investigate the extent of his jurisdictional authority. Instead, Deputy Murray was responding to Engleman's emergency call regarding prowlers at his parents' residence. Only during the course of responding to the call for assistance did Deputy Murray discover the outstanding arrest warrant for Engleman at this Arkansas address. Under these circumstances, a reasonable officer could not be expected to conduct a more thorough investigation. *Cf. Scott*, 349 F.3d at 1074 ("[T]here can always be more investigation to verify identity. The question is, how much investigation does the Constitution require?"). In light of the strong objective evidence and circumstances of this case, these protests, occurring in the midst of an arrest, did not make Deputy Murray's belief objectively unreasonable.

Engleman next claims that Deputy Murray should have known that Engleman had been arrested at 24512 Van Fleet Road in 2003 and that the charges had been dropped in 2004 because the arrest took place in Oklahoma. We reject this argument. First, the release report does not indicate why the charges were dropped. It only states that the prosecutor dismissed some, but not all, of those charges. Second, Engleman offers no evidence that Deputy Murray knew or should have known about the disposition of previous charges against Engleman, much less that he should have known the reasons why some of the previous charges against Engleman were dropped. *See, e.g.*, *Harlow*, 457 U.S. at 815. There is no evidence that Deputy Murray was involved in the prior arrest or had any knowledge of it.

Engleman points to an unidentified officer's single statement, "We got away with it once," as evidence that Deputy Murray should have known that they were

arresting Engleman in Oklahoma. While we must view the facts in the light most favorable to Engleman, we must only take as true the facts Engleman asserted that are properly supported by the record. *Wilson*, 260 F.3d at 951. Engleman does not allege that Deputy Murray made the statement, that Deputy Murray heard the statement or that Deputy Murray was even present when the statement was made. According to Engleman's complaint, at the time this statement was made, one of the Benton County officers was "back behind [his] dad's shop building," one was inside his parents' house, and the one who made the statement was to his far left. The record does not identify Deputy Murray's location at the time the statement was made, and no evidence suggests that he was within earshot of the officer who made it. Thus, it would be pure speculation to construe this remark from an unidentified officer in a manner that would render Deputy Murray's actions objectively unreasonable as a matter of law. *See Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008) ("As with any summary judgment motion, while we are required to make all reasonable inferences in favor of the non-moving party, we do not resort to speculation.").

Even though Deputy Murray lacked the authority to execute the valid Arkansas arrest warrant in Oklahoma, we conclude that, taking the facts in the light most favorable to Engleman, Deputy Murray's belief that he was arresting Engleman in Arkansas was objectively reasonable. Therefore, we conclude Deputy Murray did not

violate the Fourth Amendment and is entitled to qualified immunity.[5]  *See Saucier*, 533 U.S. at 206.

## III.   CONCLUSION

We reverse and remand with instructions for the district court to grant Deputy Murray's summary judgment motion.

BYE, Circuit Judge, dissenting.

I believe an out-of-state arrest by a police officer violates the clearly-established Fourth Amendment rights of the arrestee.  I also believe genuine questions of material fact remain in dispute about whether it was objectively reasonable for an officer in Deputy Murray's position to have believed he was arresting Stephen Engleman in Arkansas rather than Oklahoma.  I therefore respectfully dissent.

---

[5]Not only does Deputy Murray's objectively reasonable belief lead us to conclude that he did not violate the Constitution, we are also unconvinced that the arrest violated a clearly established constitutional right.  In considering qualified immunity, we must first decide whether the official violated a constitutional right on the facts alleged.  If we decide in the affirmative, we must then determine whether the right was clearly established, which we consider "in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id*. at 202.  Neither Engleman nor the district court cited any relevant authority on the question of whether a police officer from one state who acts in an objectively unreasonable manner in arresting an individual in another state violates a clearly established constitutional right.  *See Scott*, 349 F.3d at 1071.  Thus, even if Engleman had presented evidence that a reasonable officer would have known that he was no longer in Arkansas, we are not convinced that Deputy Murray violated a clearly established constitutional right by arresting Engleman in Oklahoma.

First, I take issue with the Court's suggestion in footnote five that Engleman's arrest did not violate a clearly established constitutional right. The Fourth Amendment guarantees the right to be free from unreasonable seizures. And, that right is clearly established in the specific context of this case, because the recognition of the jurisdictional limits of an officer executing a warrant dates back to English common law, as the Court itself notes. This is not a situation where a peace officer licensed in the state of Arkansas merely crossed a municipal or county line. Rather, the officer executed an arrest warrant in a state where he knew he was unlicensed and had no authority. Would it comport with the Fourth Amendment for an Arkansas police officer to execute a warrant in, for example, the state of Maine? No. For the same reason, an arrest by an Arkansas officer in Oklahoma violates the Fourth Amendment's prohibition on unreasonable seizures.

Second, with respect to the impropriety of granting summary judgment in this case, the Court failed to discuss a relevant fact that would have been known to an objective officer in Deputy Murray's position. A reasonable officer would have known Benton County, Arkansas, borders the state of Oklahoma and that the Engleman home is located on the road that runs along the state border – in common parlance, a state-line road. See J.A. at 84. It is undisputed the Engleman home is located on the Oklahoma side of the state-line road, not the Arkansas side. See id. Thus, from the very moment of arriving on the scene, a reasonable officer would and should have questioned whether the home was in Oklahoma, notwithstanding the fact that its mailbox may have carried an Arkansas address. My common sense tells me a deputy sheriff, employed by a county which borders another state, would be aware of where the state line is, and further, would not reasonably assume homes located on the opposite side of a state-line road are still within his jurisdiction.

In addition, shortly after approaching the home, Deputy Murray was informed by the homeowners, Billy Jay and Ann Engleman, that the home was in fact in Oklahoma, not Arkansas. The Court dismisses this information, citing cases which excuse an officer from investigating the protests of a resisting arrestee. Ante at 8-9.

Billy Jay and Ann Engleman were *not* resisting arrestees, however, but the homeowners of the very home in question. Deputy Murray was not entitled to simply ignore this information. Cf. Logsdon v. Hains, 492 F.3d 334, 343 (6th Cir. 2007) ("[O]fficers . . . may not off-handedly disregard potentially exculpatory information made readily available by witnesses on the scene" when executing an arrest); Sevigny v. Dicksey, 846 F.2d 953, 957 n.5 (4th Cir. 1988) ("[A qualified immunity analysis] must charge [an officer] with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances. . . . As the Seventh Circuit has recently put it in a case quite similar to this one, '[a] police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest.'") (quoting BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)).

Finally, we are charged with the responsibility of viewing the facts in the light most favorable to Engleman and taking as true the facts he asserts. Wilson v. Lawrence County, 260 F.3d 946, 951 (8th Cir. 2001). Thus, we must assume for purposes of resolving Deputy Murray's qualified immunity claim that at least one of the three deputy sheriffs who arrested Engleman not only questioned whether the arrest was being executed in Oklahoma, but actually *knew* that to be the case, for that is the inference a reasonable juror could make to explain why the officer said, "We got away with it once."

Engleman avers that one of the three deputy sheriffs on the scene made this statement shortly before he was placed in Deputy Murray's squad car and transported to jail. A reasonable jury could infer Deputy Murray was with Engleman when he was placed in *Deputy Murray's* squad car – after all, executing the arrest was Deputy Murray's purpose for being there. Thus, if we are truly viewing the facts in the light most favorable to Engleman, Deputy Murray was either present when the statement was made or was the officer who made the statement.

Assuming Deputy Murray merely heard the statement, a reasonable officer in his position should have questioned whether he was acting lawfully if he suspected

another officer *knew* the arrest was unlawful, particularly when coupled with his knowledge that the Engleman home was located on the wrong side of the state line road, and direct statements by the homeowners indicating their home was in Oklahoma. And clearly, if Deputy Murray was the officer who made the statement, he is not entitled to qualified immunity. Whether Deputy Murray heard, or made, the statement which indicated the declarant knew the arrest was unlawful, is a disputed issue of fact which should not be resolved on summary judgment.

I would affirm the district court's denial of qualified immunity for Deputy Murray on Engleman's Fourth Amendment claim. I respectfully dissent.

_____